UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-61624-Civ-COOKE

RODOLFO ORLANDO MARTINEZ,

    Plaintiff

vs.

NAJMY HALABI, *et al.*,

    Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before me on Defendants' Motion for Final Summary Judgment. (ECF No. 68). I have reviewed the arguments, the record, and the relevant legal authorities. For the reasons provided in this Order, the Defendants' Motion is granted.

### I. BACKGROUND

Plaintiff Rodolfo Orlando Martinez brings this action for use of excessive force during an arrest, in violation of 42 U.S.C. §1983. The defendants are Broward County Sheriff's Office ("BSO") detectives Najmy Halabi and Tim Concannon, and BSO SWAT Team members Christopher Hickox and Andrew Cardarelli. The following facts are undisputed unless otherwise stated.[1]

Martinez, and two non-parties, Lazaro Cruz and Donald Duhart, were the subject of a joint undercover operation conducted by the Broward County Sheriff's Office's Auto Theft Task

---

[1] The facts set forth in the Defendants' Statements of Undisputed Facts are deemed admitted to the extent that they are supported by evidence in the record, and are not specifically disputed in an opposing statement of facts. S.D. Fla. L.R. 7.5(D); *see also Gossard v. JP Morgan Chase & Co.*, 612 F. Supp. 2d 1242, 1245-46 (S.D. Fla. 2009).

Force, Strategic Investigations Division, and by the U.S. Department of Alcohol, Tobacco, and Firearms. Detectives Concannon and Halabi were conducting an investigation involving a motorcycle theft ring when they learned that Duhart and Cruz were interested in doing robberies and had done them before. Detective Concannon presented the two men with a scenario of a fictitious robbery involving an individual that Concannon knew would have a large amount of narcotics and money at his home. From September 2-26, 2008, Concannon and Halabi held meetings with Martinez, Duhart, and Cruz to discuss the robbery. The detectives ultimately arranged to meet Martinez, Duhart, and Cruz on October 7, 2008, at a warehouse in Broward County to finalize plans for the home-invasion robbery.

The events at the warehouse on October 7, 2008, are the subject of the present lawsuit. These events were captured on several surveillance cameras located throughout the warehouse. Shortly after Martinez arrived at the warehouse, he displayed a long assault rifle-looking weapon to be used at the robbery that night. A part of the meeting at the warehouse occurred in a small inner office and lounge area. This room contained a surveillance camera and audio recorder, which captured the events. During a meeting in the inner office, Martinez sat on a couch with the loaded assault rifle by his right side. The detectives discussed the home-invasion robbery and the men, including Martinez, agreed to commit that crime. SWAT Team members Hickox and Cardarelli watched the undercover operation unfold via television monitor in a hidden room that was adjacent to the inner office and lounge area.

At some point during the meeting, Concannon and Halabi left the inner office and gave the pre-arranged take-down arrest signal. Concannon and Halabi proceeded to another inner office in the warehouse, where they remained until the BSO SWAT Team completed the take-down, and took Martinez, Duhart, and Cruz into custody. Concannon and Halabi did not

participate in the actual take-down action.  It is undisputed that Concannon and Halabi were not present in the room when the alleged excessive force was used against Martinez.

BSO SWAT Team members Hickox and Cardarelli had assigned to each other specific sectors of the room that they were supposed to secure.  Cardarelli covered the room from the center left, which included Duhart's and Cruz's positions, and Hickox covered the center right, which included Duhart's and Martinez's positions.

After Concannon and Halabi gave the pre-arranged signal, the BSO SWAT Team members entered the room by pushing through a fake panel on the wall, which came out in Martinez's direction.  Hickox yelled, "Sheriff's Office, don't move, don't move."  Cardarelli stated that he and Hickox used the command, "don't move," instead of "let me see you hands" because they knew the suspects were armed and wanted the message to be clear that the suspects were not to move upon the team's entry into the room.  (Cardarelli Aff. ¶ 10).

Cardarelli stated that he saw Cruz move his hand towards his pants pocket, where he kept his handgun.  (*Id*. ¶¶ 11-12).  In response to that hand movement, Cardarelli shot one round at Cruz, striking him in the right side of the chest.  (*Id*. ¶ 10).  Hickox stated that he saw Martinez move his right arm back and his left arm forward towards his right side where his assault rifle was located.  (Hickox Aff. ¶¶ 9-10).  In response to those hand movements, Hickox fired two rounds at Martinez, striking him in the chest.  (*Id*. ¶10).  Cardarelli stated that he heard Hickox fire the two rounds at Martinez.  (Cardarelli Aff. ¶ 12).  He stated that, because Martinez failed to comply with Hickox's verbal commands, he fired one round at Martinez, which struck him in the chest.  (*Id*.)  Duhart was not shot during this incident.

Defendants Hickox and Cardarelli seek summary judgment on the grounds that (i) their use of deadly force against Martinez was not excessive, and (ii) they are entitled to qualified

3

immunity. Defendants Halabi and Concannon seek summary judgment on the grounds that (i) they did not use any force against Martinez, and (ii) they are entitled to qualified immunity.

## II. LEGAL STANDARDS

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of [Rule 56(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Rule 56(c) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. In a case involving video evidence, a court accepts the video's depiction of the events at issue "[w]here the video obviously contradicts Plaintiff's version of the facts." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010). "But, even where the entire series of events is recorded, video evidence is not obviously contradictory if it fails to convey spoken words or tone, or fails to provide an unobstructed view of the events." *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011).[2]

### III. ANALYSIS

**A. Defendants Christopher Hickox and Andrew Cardarelli**

A court must analyze a claim that a law enforcement officer used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of an individual, under the Fourth Amendment "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations omitted). "To balance the necessity of the use of force used against the arrestee's constitutional rights, a court must evaluate several factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 396).

---

[2] In this case, the video included audio recording and provided an unobstructed view of the events.

5

"[T]here is no precise test or 'magical on/off switch' to determine when an officer is justified in using excessive or deadly force." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (quoting *Scott*, 550 U.S. at 382). Instead, "the particular facts of each case must be analyzed to determine whether the force used was justified under the totality of the circumstances." *Id*. When conducting such an analysis, "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Id*. (citing *Graham*, 490 U.S. at 396). When assessing whether an officer's actions were "objectively reasonable," the court must consider "the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 1166-67 (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 397). "Those facts and circumstances are often 'tense, uncertain and rapidly evolving,' thereby requiring 'split-second judgments' as to how much force is necessary." *Id*. at 1167 (quoting *Graham*, 490 U.S. at 397). "Because an officer's perspective in the field differs from that of a judge sitting peacefully in chambers, we must resist the temptation to judge an officer's actions 'with the 20/20 vision of hindsight.'" *Id*. (quoting *Graham*, 490 U.S. at 396).

Further, qualified immunity protects government officials sued in their individual capacities where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard*, 311 F.3d at 1346 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). An officer is entitled to qualified immunity "if his actions were objectively reasonable, that is if an objectively reasonable officer in the same situation could have believed that the force used was not excessive." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 638-41 (1987)). "Thus, the qualified immunity standard is broad

6

enough to cover some mistaken judgment, and it shields from liability all but the plainly incompetent or those who knowingly violate the law." *Garczynski*, 573 F.3d at 1167.

The events leading up to Martinez's shooting can certainly be described as tense, uncertain, and rapidly evolving. Cardarelli and Hickox had watched the surveillance video in an adjacent room. They therefore knew that some of the suspects, including Martinez, were armed. They also knew where those weapons were located on the suspects. Cardarelli and Hickox had reasonable reason to believe that the suspects, including Martinez, were dangerous, as they had recently agreed to commit a home-invasion robbery, and brought weapons to commit that serious crime.

Cardarelli and Hickox were forced to make split-second decisions regarding their safety and the safety of others as soon as they pushed in the fake panel on the inner office's wall and announced themselves. The evidence, including the audio-video recording, shows that the officers yelled, "don't move, don't move." (*See* Hickox Aff. ¶ 8). Hickox stated that he saw, and the video supports, Martinez move his hands in the direction of where his weapon was located. (*Id*. ¶ 9). Hickox stated that the feared for his safety and the safety of his fellow officers, and responded to Martinez's movements and his failure to comply with the command to not move by shooting two rounds at him. (*Id*. ¶10).

Hickox reasonably perceived Martinez's actions as posing an immediate threat to his safety and the safety of others. The fact that Martinez never waived a weapon at him is not determinative. "The law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (finding officer's use of deadly force was objectively reasonable and noting that, "[r]egardless of whether [the defendant] had drawn his

7

gun, [the defendant's] gun was available for ready use, and [the officer] was not required to wait and hope for the best." (internal quotation marks omitted)).

Cardarelli stated that, upon hearing Hickox fire two rounds, he turned and fired another round into Martinez. (Cardarelli Aff. ¶¶11-12). Cardarelli stated that he fired his weapon because Martinez failed to comply with Hickox's verbal command to not move and he feared for his safety and the safety of his fellow officers. (*Id*. ¶¶ 12-13). Cardarelli stated that he also wanted to ensure that Martinez did not escalate the encounter into a hostage-type situation. (*Id*. ¶ 13). The video makes clear that Hickox's and Cardarelli's shots occurred in rapid succession in a matter of seconds.

"A police officer is entitled to continue his use of force until a suspect thought to be armed is fully secured." *Jean-Baptiste*, 627 F.3d at 821 (internal quotation marks omitted). Cardarelli reasonably responded with deadly force to ensure that Martinez was disarmed and posed no further threat to the officers. *See id*. at 822; *Carr v. Tatangelo*, 338 F.3d 1259, 1273 (11th Cir. 2003) (qualified immunity applied to officer who, after hearing a fellow officer shoot one round, fired his gun eight times at a suspect, shooting to kill in order to "eliminate the threat").

I have reviewed the evidence in the light most favorable to Martinez, but I accept the unobstructed audio-video's depiction of the relevant events. I do not find that material issues of fact exist to prevent the entry of summary judgment in favor of Defendants Cardarelli and Hickox. Under the circumstances, Cardarelli's and Hickox's decisions to shoot Martinez were objectively reasonable. *See, e.g.*, *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) ("[T]he Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an

imminent threat of danger to a police officer or others."). The officers are entitled to qualified immunity. *See, e.g.*, *Jean-Baptiste*, 627 F.3d at 822; *Carr*, 338 F.3d at 1273-74.

### B. Defendants Najmy Halabi and Tim Concannon

Martinez claims that, although Defendants Halabi and Concannon did not personally use excessive force on him, they are liable on a theory of proximate causation. Specifically, Martinez argues that Halabi and Concannon set in motion a series of acts that resulted in Cardarelli and Hickox shooting Martinez, and it was reasonably foreseeable to them that the shooting would occur.

Common law tort principles of damages and causation apply in the § 1983 context. *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000). "For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue." *Id*. Because I find that Cardarelli and Hickox did not use excessive force, the claims against Halabi and Concannnon — that they proximately caused that alleged constitutional tort — must fail under Martinez's theory of the case. *See also Johnson v. Niehus*, No. 105-125, 2007 WL 1185675, at *8 (S.D. Ga. Apr. 18, 2007). Absent the existence of a constitutional tort, Martinez's claims against Halabi and Concannon must be dismissed.

### IV. CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that:

1. Defendants' Motion for Final Summary Judgment (ECF No. 68) is **GRANTED**. This case is **DISMISSED** against all defendants.

9

2. The Clerk is directed to **CLOSE** this matter. All pending motions, if any, are **DENIED** *as moot*.

**DONE and ORDERED** in chambers, at Miami, Florida, this 25th day of January 2012.

*Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Patrick A. White, U.S. Magistrate Judge*
*Counsel of record*
*Rodolfo Orlando Martinez*, pro se